IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHARLES N. BROWN,

       Plaintiff,

v.

DR. CARNEVALE, PRISON HEALTH
SERVICES, DAVID NOWACK,
DR. JAY KRAVITZ, NURSE DOE,
WASHINGTON COUNTY, DEPUTY
RYAN POPE, DEPUTY RICHARD
LYONS, SGT. DIAMOND, BOB
THEISSEN, and WASHINGTON
COUNTY SHERIFF,

       Defendants.

06-CV-1238-BR

OPINION AND ORDER


**CHARLES N. BROWN**
# 4174405
Snake River Correctional Institution
777 Stanton
Ontario, OR 97914

       Plaintiff, *Pro se*

1 - OPINION AND ORDER

**MICHAEL T. STONE**
**JAMES M. DAIGLE**
Brisbee & Stockton, LLC
139 N.E. Lincoln Street
P.O. Box 567
Hillsboro, OR 97123
(503) 648-6677

>  Attorneys for Defendants Prison Health Services,
>  Dr. Carnevale, David Nowack, and Nurse Jane Doe
>  (hereinafter referred to as Private Defendants)

**DAN R. OLSEN**
Washington County Counsel
**WILLIAM G. BLAIR**
Senior Assistant Washington County Counsel
155 N. First Avenue, Suite 340 - MS 34
Hillsboro, OR 97124-3072
(503) 846-8747

>  Attorneys for Defendants Washington County, Washington
>  County Sheriff, Dr. Kravitz, Sergeant Diamond,
>  Commander Bob Theissen, Deputy Ryan Pope, and Deputy
>  Richard Lyons (hereinafter referred to as County
>  Defendants)

**BROWN, Judge.**

This matter comes before the Court on the Corrected Motion (#125) for Summary Judgment of County Defendants.

For the reasons that follow, the Court **GRANTS** County Defendants' Motion for Summary Judgment.

## BACKGROUND

On October 31, 2004, Plaintiff was a pretrial detainee in the maximum security pod (Pod 3) of the Washington County Jail. On that date, Deputies Ryan Pope and Richard Lyons were on duty

2 - OPINION AND ORDER

in Pod 3. At approximately 5:52 a.m., Matthew Gallagher, another inmate, entered Plaintiff's cell and assaulted Plaintiff after Plaintiff's cell door locked automatically. After assaulting Plaintiff, Gallagher used the intercom in Plaintiff's cell to call Deputy Lyons and to tell him that he had entered Plaintiff's cell by mistake. Deputy Lyons opened Plaintiff's cell door automatically from the Pod 3 Command Center and ordered Gallagher back to his cell. According to Plaintiff, he "buzzed" Deputy Lyons after Gallagher left and informed Deputy Lyons that he was injured.

At 6:00 a.m., Deputy Lyons observed Plaintiff's injuries and summoned medical staff and backup deputies. Iris Nobel, L.P.N., responded to the summons and examined Plaintiff. According to Plaintiff, Nurse Nobel provided him with aspirin and an icepack for his injuries.

On December 2, 2004, Plaintiff was examined at Tualatin Community Hospital and diagnosed as having suffered a "two part fracture of the right zygomatic arch." On December 20, 2004, Plaintiff submitted a Health Care Request in which he noted he was suffering from headaches and other physical symptoms associated with his injuries. Prison Health Services (PHS) responded by putting Plaintiff on the list for an appointment with a medical doctor at Oregon Health Sciences University (OHSU).

3 - OPINION AND ORDER

On January 7, 2005, OHSU physician Geoffrey H. Buncke, M.D., examined Plaintiff and reported he had a "right zygomatic fracture with pain in tempromandibular joint."  Dr. Buncke opined

> [n]one of the diagnoses that I have listed today in my review of [Plaintiff's] . . . face represent an urgent medical problem.  This does not need to be addressed in an urgent fashion. . . .  I recommend [Plaintiff] has a followup with our Maxillofacial specialist, Dr. Ozaki, at OHSU for evaluation of his right zygomatic fracture in more details.

Pl.'s Br. in Support of Mot. to Deny Def.'s Mot. for Summ. J., Ex. J.

On February 22, 2005, Reid Mueller, M.D., examined Plaintiff at OHSU.  Dr. Mueller opined Plaintiff had a "zygomatic arch fracture, possible impingement syndrome."  Dr. Mueller recommended Plaintiff obtain a facial CT scan "so that we might make some assessment about the likelihood of his impingement syndrome."  Dr. Mueller noted he would make a plan for treatment after Plaintiff obtained a CT scan.

On March 22, 2005, Plaintiff was examined by Dr. Meuller again.  Dr. Mueller reported Plaintiff's CT scan showed a "displaced comminuted right zygoma fracture with a significantly depressed comminuted segment that is resulting in impingement syndrome."  Dr. Mueller recommended Plaintiff undergo surgery to address the fracture and impingement.  On April 1, 2005, Plaintiff underwent surgery.  The doctor prescribed oxycodone for pain.  On April 4, 2005, Plaintiff submitted a Health Care

4 - OPINION AND ORDER

Request to PHS in which he asserted he had received inadequate pain support because PHS had doubled his Vicodin rather than giving him a Nubaine shot. He also submitted a Health Care Request on April 5, 2005, in which he asked for more pillows to elevate his head, inquired when his head was going to be cleaned, and complained that he did not want and did not request more pain medication.

On April 11, 2005, PHS staff responded to Plaintiff's April 4, 2005, Health Care Request regarding pain medication and noted PHS had not received orders from a doctor to increase Plaintiff's pain medication. In fact, PHS staff asserted Dr. Scott reduced Plaintiff's medication, and PHS staff had followed the physician's orders. Defendant Tony Carnevale, M.D., saw Plaintiff on April 28, 2005, and addressed Plaintiff's pain-medication issues.

Plaintiff filed a number of grievance appeals with Jay Kravitz, M.D., Health Officer for Washington County, relating to Plaintiff's assertion that he received inadequate medical care from April 1 through April 5, 2005. On June 6, 2005, Dr. Kravitz responded to Plaintiff's appeals and concluded Plaintiff was receiving "appropriate and satisfactory care."

On August 28, 2006, Plaintiff filed an action in this Court pursuant to 42 U.S.C. § 1983 in which he alleged Washington County, Washington County Sheriff, Deputy Pope, and Deputy Lyons

5 - OPINION AND ORDER

violated his right to due process because they failed to provide him with a safe environment free from assault by other inmates. He also alleged the medical staff at Washington County Jail violated his right to be free from cruel and unusual punishment by their deliberate indifference to his serious medical needs.

    On February 27, 2007, Defendants Kravitz and PHS filed a Motion to Dismiss on the ground that Plaintiff did not allege any facts on which a claim for relief could be based against these Defendants.

    On July 9, 2007, the Court issued an Opinion and Order in which it dismissed Plaintiff's claims against Defendants Dr. Kravitz and PHS without prejudice and granted Plaintiff leave to file an amended complaint no later than August 9, 2007, to cure the deficiencies set out in the Court's Opinion and Order.

    On August 6, 2007, Plaintiff filed an Amended Complaint pursuant to 42 U.S.C. § 1983 in which he alleges (1) Washington County Sheriff Rob Gordon, Sergeant Diamond, Commander Theissen. Deputy Pope, and Deputy Lyons violated his rights under the Fourteenth Amendment because they failed to provide him with a safe environment free from assault by other inmates; (2) Dr. Kravitz violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution because he was deliberately indifferent to Plaintiff's serious medical needs

when he failed to respond to Plaintiff's grievances; and (3) Private Defendants also violated his rights under the Fourteenth Amendment to the United States Constitution because they were deliberately indifferent to Plaintiff's serious medical needs.  Plaintiff seeks damages and a declaration that Defendants violated his rights under the United States Constitution.

On November 9, 2007, the Court issued an Opinion and Order granting the Motion to Dismiss of Defendants Carnevale, Nowack, and Doe on the ground that the Court lacked personal jurisdiction over them because Plaintiff did not properly serve them.

On March 24, 2008, PHS filed a Motion for Summary Judgment.[1] On April 28, 2008, County Defendants filed a Motion for Summary Judgment and on June 9, 2008, received leave of Court to file their Corrected Motion for Summary Judgment.

On October 9, 2008, the Court issued an Opinion and Order granting PHS's Motion for Summary Judgment.  On October 14, 2008, the Court heard oral argument on County Defendants' Corrected Motion for Summary Judgment.

## STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary

---

[1] On January 24, 2008, the Court issued a Summary Judgment Advice Notice advising Plaintiff that if he did not submit evidence in opposition to any motion for summary judgment, judgment would be entered against him if it was appropriate.

7 - OPINION AND ORDER

judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id.*

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Id.* "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be

necessary." *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

### I. 42 U.S.C. § 1983.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To establish a claim under § 1983, a plaintiff must initially allege "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a constitutional right." *L.W. v. Grubbs (Grubbs I),* 974 F.2d 119, 120 (9th Cir. 1992). State

officials or municipalities are liable for deprivations of life, liberty, or property that rise to the level of a "constitutional tort" under the Due Process Clause of the Fourteenth Amendment. *Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007). The Fourteenth Amendment does not require the state to protect individuals against the deprivations of life, liberty, or property by private actors. *Id.* at 195.

**II. Analysis**.

As noted, Plaintiff asserts County Defendants violated his right to due process because they failed to provide him with a safe environment free from assault by other inmates. Plaintiff also asserts Dr. Kravitz was deliberately indifferent to Plaintiff's serious medical needs in violation of Plaintiff's rights as a pretrial detainee under the Fourteenth Amendment to the United States Constitution when Dr. Kravitz failed to respond to Plaintiff's grievances.

Because Plaintiff was a pretrial detainee at all relevant times, the Court analyzes his claims under the Fourteenth Amendment rather than under the Eighth Amendment. *See Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998)("Pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, [and, therefore, the Court] applies the same standards."). *See also Hydrick v. Hunter*, 500 F.3d 978, 998 (9th Cir. 2007)("[B]ecause the contours

10 - OPINION AND ORDER

of the Eighth Amendment are more defined, Eighth Amendment jurisprudence may provide helpful guidance as to the standards to be applied [to Fourteenth Amendment analysis].").

      **A.**    **Plaintiff's claims against Defendants Commander Theissen, Sergeant Diamond, and Sheriff Gordon.**

"Liability under section 1983 arises only upon a showing of personal participation by the defendant" in the alleged constitutional deprivation. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Liability may also be imposed if the defendant sets into "'motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1044 (9th Cir. 1994)(quoting *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987)). "'A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991)(quoting *Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987)). It is well-established, however, that "§ 1983 does not impose liability on individuals for the acts of their subordinates under a *respondeat superior* theory of liability." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978).

11 - OPINION AND ORDER

Plaintiff asserts Defendant Theissen was the Commander of the Washington County Jail on October 31, 2004, and Defendant Diamond was the sergeant on duty on October 31, 2004. Plaintiff does not contend any specific conduct by Commander Theissen, Sergeant Diamond, or Sheriff Gordon caused Plaintiff's alleged constitutional deprivations or set into "motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." For example, Plaintiff does not allege and does not provide any evidence that these Defendants had prior knowledge that Plaintiff would be subject to attack by Gallagher, that they prevented him from receiving the level of medical care to which he believes he was entitled, or that they designed or implemented the design of Pod 3.

Accordingly, the Court grants County Defendants' Motion for Summary Judgment as to Plaintiff's claims against Defendants Commander Theissen, Sergeant Diamond, and Sheriff Gordon that are, in effect, impermissibly based on a theory similar to *respondeat superior*.

    **B.    Plaintiff's Fourteenth Amendment claim against County Defendants for failure to provide a safe environment.**

Plaintiff asserts County Defendants violated his rights under the Fourteenth Amendment when they failed to provide a safe environment for him by placing him in Pod 3 because the procedures governing Pod 3 are fatally flawed in that they result

12 - OPINION AND ORDER

in certain areas of Pod 3 being regularly unobserved for 15 minutes at a time.

### 1. Deliberate Indifference

The Supreme Court held in *Farmer v. Brennan* that "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" 511 U.S. 825, 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Prison officials have the same duty to protect pretrial detainees. *Frost,* 152 F.3d at 1128. In *Farmer*, the Court noted:

> Having incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, [and] having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. . . . Prison conditions may be "restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e] any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."

511 U.S. at 833-34 (internal quotations and citations omitted). Nevertheless, "every injury suffered by one prisoner at the hands of another [does not] translate[] into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. The Court in *Farmer* specifically rejected the petitioner's argument that "*Canton [v. Harris*, 489 U.S. 378

13 - OPINION AND ORDER

(1989)] compels the conclusion . . . that a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it."  *Id*. at 841-42.  The Court concluded

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the inflic- tion of punishment.

*Id*. at 837 (internal citations omitted).

### 2. Analysis

According to County Defendants,

> Pod 3 is one of several self-contained housing units at the Washington County Jail.  Each pod is accessed from a long central hallway. Entry into Pod 3 from that central hallway is through a vestibule door system where a locked door, primarily controlled from a secure control center inside the pod, opens into a waiting area where entrants wait between the closing of the outer door and the opening of an inner door.
>
> Unlike the other housing pods in the Washington County Jail, Pod 3 is compartmentalized into three sections.  Access between the sections is controlled by a locked door, and entrance to each of the sections from the main corridor of the jail is through a door to each section in a common foyer inside the entrance to Pod 3.  Pod 3 contains cells on two tiers.  Each cell is

>       designed to house only one person.
> 
>       One deputy is required to remain in a locked control center at all times. From that location the control center deputy can observe the doors to each of the three sections, and of each of the cell doors as well as the shower facilities and foyer. From the control center the deputy stations there can open or close individual cell doors, the doors between sections, the doors into each section from the foyer, and the vestibule entry door to Pod 3. The control center deputy also has communication with each cell via an intercom built into the wall of each cell.
> 
>       The second deputy, denominated a "rover," remains outside the command center and walks "rounds" between each of the three sections, oversees the distribution of meals, and can interact one-on-one with prisoners outside their cells. Deputies are forbidden to enter an occupied cell for any purpose unless there is at least one backup deputy present.
> 
>       The security provisions designed into Pod 3, and the procedures adopted to take advantage of them, were very carefully considered in the last 1990s when the jail was designed. The design and implementing procedures were based on the plan that Pod 3 would be used as a maximum security holding facility in which three classes of prisoners would be housed: 1) inmates who had violated jail rules such that segregation from the general population of the jail was found to be appropriate sanction; 20 inmates whose prior history and behavior warranted treating them as being a high risk of either violence or attempt to escape; 3) inmates whose personal safety in the institution warranted segregation from the general population.

Decl. of Rob Gordon ¶¶ 5-9.

       Plaintiff asserts the roving officer in Pod 3 tours each of the three units each hour, and the control-center officer observes only the roving officer while he is touring the

15 - OPINION AND ORDER

units.  Thus, according to Plaintiff, the two units that the roving officer is not touring remain unobserved by the control-center officer for approximately 15 minutes each hour.  Plaintiff contends he was assaulted during the time his unit was not being observed.  Plaintiff also argues this "blind spot" is well-known to inmates residing in Pod 3, and, therefore, that time is used by inmates to engage in illegal conduct.  Thus, Plaintiff maintains County Defendants should have known of the risk to inmate health or safety during those periods.

     At oral argument, defense counsel noted the design of Pod 3 and pointed out that it enables the control-center deputy to observe the doors to each of the three sections of Pod 3, the individual cell doors, the shower facilities, and the foyer.  Defense counsel also informed the Court that it is not Defendants' policy to have the control-center deputy observe the roving deputy at all times or to leave portions of Pod 3 unobserved at predictable times.  In fact, the control-center deputy observes all of the areas of Pod 3 from the control center as thoroughly as possible.

     The Court notes Plaintiff has not produced any evidence of a  policy of the type he contends existed; for example, testimony from other inmates, guards, or personnel; written guidelines or procedures; or even statistics or information as to the number of assaults that occur annually in

16 - OPINION AND ORDER

Pod 3 as opposed to the rest of the facility.  In essence, Plaintiff merely speculates that such a policy exists.  In addition, Plaintiff has not produced any evidence other than his own statements that Defendants are aware of any "blind spots" or regular spans of time when certain units are not being observed. Although Plaintiff has experience as an inmate, it is insufficient standing alone to make his assertions regarding "blind spots" into jury questions.  As the Court advised Plaintiff in its January 24, 2008, Summary Judgment Advice Notice, Plaintiff "must present admissible evidence, not mere speculation" to survive summary judgment.  *See Paladin Assoc., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1161 (9th Cir. 2003).

On this record, the Court concludes Plaintiff has not established a genuine issue of material fact exists that County Defendants knew there was an excessive risk to inmates' safety and disregarded that risk or that County Defendants actually "drew an inference of risk" to inmates in Pod 3 but did not take any action to alleviate that risk.

Accordingly, the Court grants County Defendants' Motion for Summary Judgment as to Plaintiff's claim against County Defendants for violation of the Fourteenth Amendment for failure to provide him with a safe environment.

    **C.**    **Plaintiff's claims against Dr. Kravitz**.

Plaintiff alleges Dr. Kravitz was deliberately

17 - OPINION AND ORDER

indifferent to Plaintiff's medical needs when he did not respond to Plaintiff's April 2005 grievances until June 5, 2005.

    **1. Deliberate Indifference.**

"To hold . . . Defendants violated [an inmate's] right to adequate medical care, we must find that the officials acted with deliberate indifference in failing to respond to a serious medical need. Mere negligence in the provision of medical care, however, does not constitute a constitutional violation." *Frost*, 152 F.3d at 1130 (citations omitted).

    **2. Analysis.**

Dr. Kravitz testifies in his Declaration that his review of the medications provided to Plaintiff and the care provided to Plaintiff in April 2005 were medically reasonable and adequate. Dr. Kravitz stated Plaintiff received medications relating to his medical and psychiatric conditions, and the course of treatment provided to Plaintiff after surgery, albeit conservative, was appropriate. Dr. Kravitz testifies there was not any damage to or aggravation of Plaintiff's injuries that resulted from any alleged delay in providing medications.

Again, Plaintiff has not offered any evidence to establish the care that he was provided by PHS was inadequate. The record reflects PHS staff responded to Plaintiff's various grievances related to his pain medication after Plaintiff's surgery. In addition, although Plaintiff did not receive a

18 - OPINION AND ORDER

response to his grievances from Dr. Kravitz until June 2005 because Dr. Kravitz was on vacation, Dr. Kravitz ultimately concluded the care Plaintiff grieved about was adequate. Although the failure of Plaintiff to receive a prompt response to his April 2005 grievances is regrettable, the Court concludes it does not rise to the level of deliberate indifference.

Accordingly, the Court grants County Defendants' Motion for Summary Judgment as to Plaintiff's claim against Dr. Kravitz.

## CONCLUSION

For these reasons, the Court **GRANTS** the Corrected Motion (#125) for Summary Judgment of Defendants Washington County; Washington County Sheriff; Jay Kravitz, M.D.; Sargent Diamond; Commissioner Theissen; Deputy Ryan Pope; and Deputy Richard Lyons and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 10th day of December, 2008.

/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge

19 - OPINION AND ORDER